DEAN M. CONWAY
*(counsel for service)*
SARRA CHO
Email:  conwayd@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4412
Facsimile: (202) 772-9245

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> ARI J. LAUER, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** |

**JURY DEMAND**

Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), for its Complaint alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  Defendant committed many of the acts set forth in this Complaint in this district.  For example, Lauer sent numerous documents via email to employees of DC Solar Solutions, Inc., which was located in this district.

## SUMMARY

4.      This case involves fraudulent securities offerings and a massive Ponzi scheme that raked in over $910 million in investor funds.  The scheme was orchestrated by Jeffrey and Paulette Carpoff, who sold securities through their privately held alternative energy companies DC Solar Solutions, Inc. ("DC Solutions") and DC Solar Distribution, Inc. ("DC Distribution") (collectively, with Jeffrey and Paulette Carpoff, "DC Solar").  The Defendant in this action, Ari J. Lauer ("Lauer"), played an important role in the scheme from its inception.

5.      DC Solar, which was in the business of making, leasing, and operating mobile solar generators ("Generators"), offered investment opportunities that purportedly delivered gains in the form of tax benefits, guaranteed lease payments, and additional profits from the leasing of the Generators.  As part of the investment, investors purchased Generators from DC Solutions and then immediately leased them to DC Distribution.  DC Distribution was then supposed to sub-lease the Generators to end-users.  DC Solar touted itself as a major player in its industry, with thousands of Generators in the field, lucrative lease agreements with big customers yielding a track record of consistent revenue, and extensive experience in making and maintaining the Generators and finding customers for them.

6.      That was all a sham.  In reality, thousands of the purportedly profitable

Generators were never even manufactured, let alone put into use, and the vast majority of alleged "revenue" sent to investors came from investor money, not from actual lease payments from end-users of the Generators.

7.     Lauer, an attorney licensed to practice law in California, advanced the scheme by lending the imprimatur of a lawyer to the operation.  Despite knowing that the lease revenue on which the investments depended was virtually non-existent, Lauer papered the transactions on behalf of DC Solar and materially misled investors about the true nature of the business and the amount of legitimate lease revenue. Over the course of many years, he negotiated, drafted and provided transaction documents to investors that promised payments based on revenue produced by DC Distribution leasing the Generators to end-users, despite knowing that DC Distribution was never able to lease the Generators on any scale and was dependent on transfers of money from DC Solutions in order to meet its contractual lease payments.

8.     As a result of the conduct alleged herein, Defendant Lauer has violated the antifraud provisions of the Securities Act and the Exchange Act.  Defendant Lauer also aided and abetted Jeffrey Carpoff's and Paulette Carpoff's antifraud violations.  The SEC seeks entry of permanent injunctions against Lauer as well as disgorgement of ill-gotten gains and prejudgment interest thereon and civil money penalties.

## THE DEFENDANT

9.     Ari J. Lauer is a resident of Lafayette, CA.  He is licensed to practice law in the State of California.  He served as outside counsel and the de facto General Counsel of DC Solar from approximately 2009 through 2018.

## RELATED INDIVIDUALS AND ENTITIES

10.     Jeffrey P. Carpoff ("J. Carpoff") was a resident of Martinez, CA during the course of the scheme.  In addition to owning DC Solutions, J. Carpoff was the President and a Director of DC Solutions and the Vice President and a Director of DC

Distribution.  J. Carpoff is currently serving a 30-year sentence in federal prison relating to the misconduct alleged herein.

11.    Paulette Carpoff was a resident of Martinez, CA during the course of the scheme period.  In addition to owning DC Distribution, Paulette Carpoff was the President, Secretary, Treasurer, and a Director of DC Distribution and the Secretary, Treasurer and a Director of DC Solutions.  She is currently serving a sentence of 11 years and three months in federal prison, relating to the misconduct alleged herein.

12.    DC Solar Solutions, Inc. is a California corporation headquartered in Benicia, CA.  It was owned by J. Carpoff.  DC Solutions has never been registered with the SEC in any capacity.  It filed for bankruptcy protection in early 2019 and is currently in Chapter 7 proceedings.

13.    DC Solar Distribution, Inc. is a California corporation headquartered in Benicia, CA.  It was owned by Paulette Carpoff.  DC Distribution has never been registered with the SEC in any capacity.  It filed for bankruptcy protection in early 2019 and is currently in Chapter 7 proceedings.

14.    Robert A. Karmann is a resident of Clayton, CA.  He was the CFO of DC Solutions from late 2014 through 2018 after acting as its Controller.  As DC Distribution did not have its own CFO and was closely affiliated with DC Solutions, Karmann performed essentially the same CFO duties for DC Distribution as well. During his time at DC Solutions, he was licensed as a Certified Public Accountant in California.  Karmann is currently serving a six-year sentence in federal prison, relating to the misconduct alleged herein.

15.    Ronald J. Roach is a resident of Walnut Creek, California.  Roach was a certified public accountant and the owner of Ronald J. Roach Accountancy Corporation.  He has held Series 6, 7, 63 and 65 securities licenses and was a registered investment adviser and a registered representative.  Roach is scheduled to be sentenced to federal prison on December 13, 2022, relating to the misconduct alleged herein.

# FACTUAL ALLEGATIONS

## A.   Background on DC Solar

16.    Jeffrey and Paulette Carpoff were the owners and principals of DC Solutions and DC Distribution.  While DC Solutions and DC Distribution are two separate legal entities, they operated from the same location and shared the same management and employees.  DC Solar told investors that it "design[ed], manufacture[d] and lease[d] renewable energy products to serve the off-grid needs of a broad and diverse marketplace – while providing investors with access to the renewable energy asset class."

## B.   The DC Solar Securities Offerings

### (1)   The Solicitation of Investors

17.    Since at least 2011 and continuing to December 2018, DC Solar offered securities to investors.  The securities took the form of two types of investment contracts: (1) Investment Fund Contracts and (2) Sale-Leaseback Contracts.  Under both arrangements, the investors paid to purchase Generators from DC Solutions, while simultaneously leasing them to DC Distribution.  DC Distribution would then purportedly arrange to sub-lease the Generators to end-users.  Investors expected to profit from their investments due to tax credits, depreciation on the Generators, and lease payments.  Investors thus played an entirely passive role:  The success of the venture, and thus the profits to investors and DC Solar, turned entirely on the efforts of DC Solar to make, maintain, market, and lease the Generators.

18.    Over the course of the offerings, DC Solar raised approximately $910 million in investor money.  These deals had face values of more than $2.7 billion because investors in the Investment Fund Contracts financed approximately 70 percent of the amount of their investments through promissory notes.

19.    DC Solar, directly and indirectly, solicited investors through brokers and salespeople using various methods, including email, conference calls, and in-person meetings.  DC Solar offered and sold Investment Fund Contracts and Sale-Leaseback

Contracts through interstate commerce to investors throughout the United States.

**(2)    The Terms of the Investment Fund Contract Offerings**

20.    Investment Fund Contract investors executed a standard package of agreements, including:  (i) a Limited Liability Company Agreement ("LLC Agreement"); (ii) a Solar Equipment Purchase Agreement ("Purchase Agreement"); (iii) a Secured Promissory Note ("Promissory Note"); and (iv) a Mobile Solar Equipment Lease ("Equipment Lease") (together the "Investment Fund Contracts"). While the Investment Fund Contracts for certain deals had variations, they largely had the same substantive terms.

21.    Under the terms of the LLC Agreement, an investor became the "Investor Member" of an Investment Fund Limited Liability Company ("Investment Fund"), an entity created specifically for the purpose of the investment.  This Investment Fund then purchased Generators from DC Solutions at a price of $150,000 per Generator under the Solar Equipment Purchase Agreement.  The Purchase Agreement specified the total number of Generators being purchased as well as the total purchase price.  An Exhibit to the Purchase Agreement contained a blank space for the Vehicle Identification Numbers ("VINs") for the Generators or stated that "VIN for each Generator to be Supplied at Delivery."  In exchange for the payment, DC Solutions agreed to deliver the Generators by a certain date or dates and warranted "to Buyer that all Equipment shall be in good working order in conformity with the Specifications for a period" of five or ten years.

22.    Investors generally contributed about thirty percent of the purchase price in cash and financed the balance pursuant to a Promissory Note or Notes executed by the Investment Fund in favor of DC Solutions.  The Promissory Note was an exhibit to the Purchase Agreement.  Under the terms of the Promissory Notes, the Investment Funds owed monthly payments on the Promissory Notes to DC Solutions.

23.    Under the Investment Fund Contracts, the Generator business was entirely managed and operated by DC Solar.  At the time an Investment Fund

executed the Purchase Agreement with DC Solutions, the Investment Fund also executed the Equipment Lease with DC Distribution for at least the first batch of Generators being purchased.  Depending on the size of the transaction, as additional tranches of Generators were manufactured, more Equipment Leases were executed. Under the Equipment Leases, the Investment Funds leased their Generators to DC Distribution for terms ranging up to 120 months.

24.    The Equipment Leases further provided for a set amount of "Base Rent" to be paid in advance to the Investment Fund in monthly installments for the term of the lease as well as payment to the Investment Fund of "Additional Rent" or "Variable Rent" to the extent DC Distribution received revenue from subleasing the Generators in excess of a certain amount.  The amount of additional or variable rent due to the Investment Fund varied depending on the deal and the calculation was specified in the Equipment Lease.

25.    The Investment Fund Contracts were structured such that there was a flow of money between the Investment Funds and DC Solar, all of which was contingent on the Generators generating significant sub-lease revenue from legitimate end-users.  DC Distribution owed monthly lease payments to the Investment Funds purportedly to be paid with the sub-lease revenue it received from third-party customers.  The Investment Funds would then use the lease payments they received from DC Distribution under the terms of the Equipment Leases to make monthly payments due to DC Solutions under the terms of the Promissory Notes.  Investors expected several benefits under the arrangement, including a thirty percent energy tax credit and the ability to claim significant depreciation on the Generators.

26.    In addition, investors expected to receive profits in the form of annual cash distributions from the Investment Funds.  In general, the LLC Agreements stated that "Distributable Cash," defined as the amount of cash from lease revenue remaining after loan payments and operating expenses, would be paid out to investors on an annual basis.  Based on financial projections for the Investment Funds that

were provided to investors, investors expected to receive these cash distributions.

27.     From December 2011 through December 2018, DC Solar closed 34 Investment Fund Contracts involving 13 institutional investors, totaling about $2.57 billion in face value.  The investors made roughly $759 million in cash contributions to their Investment Fund Contracts.

### (3)     The Terms of the Sale-Leaseback Contract Offerings

28.     DC Solar began offering a second type of security, the Sale-Leaseback Contracts, in around 2017.  Investors in the Sale-Leaseback Contracts typically executed several agreements including: (i) a Sale Agreement; (ii) an Equipment Lease Agreement; and (iii) a Schedule (collectively the "Sale-Leaseback Contracts"). While the Sale-Leaseback Contracts for certain deals had minor variations in wording, they largely had the same substantive terms.

29.     The Sale-Leaseback Contracts differed from the Investment Fund Contracts in that investors purchased the Generators outright from DC Solutions, or in one instance another affiliate of DC Solar, without executing a Promissory Note. Under the Sale Agreement, investors paid $150,000 for each Generator they purchased.  The Generators were identified by VIN in an exhibit attached to that Agreement.

30.     Just as under the Investment Fund Contracts, under the Sale-Leaseback Contracts the investors immediately leased the Generators back to DC Distribution (or another affiliate of the Company) in return for monthly payments purportedly to be made from sub-lease payments.

31.     The Schedule to the Lease Agreement set forth the term of the lease and a set lease payment due to the investor each month from DC Distribution.  An attachment to the Schedule identified the Generators by VIN.  In addition to the monthly lease payments, most Sale-Leaseback Contract investors expected to be able to take the 30 percent energy tax credit as well as depreciation on the Generators they purchased.  In fact, the Schedules in certain of the Sale-Leaseback Contracts

specifically referenced the energy tax credit and depreciation and required DC
Distribution to use the Generators so as to remain eligible for those tax benefits.
Based on the combination of tax benefits and lease revenue, the Sale-Leaseback
Contract investors expected to earn a positive return and profit from these
transactions.

32.   From 2017 through 2018, DC Solar completed seven Sale-Leaseback
Contracts involving four institutional investors, in transactions worth nearly $151
million.

### (4)   The Company's Offerings Are Securities

33.   DC Solar offered and sold the Investment Fund Contracts and Sale-
Leaseback Contracts through interstate commerce to investors located in multiple
states.

34.   DC Solar's Investment Fund Contracts and Sale-Leaseback Contracts
are securities in the form of investment contracts.  They represented an investment of
money, in a common enterprise, with the expectation of profits to be derived from the
efforts of a third party.  Investors provided money to DC Solar for investment
purposes.  Because the terms of the Investment Fund Contracts and Sale-Leaseback
Contracts tied the fortunes of the investors to those of DC Solar and its ability to
manufacture the Generators and then sub-lease them to end-users at optimal rates,
investors were investing in a common enterprise.  And, because the terms of the
Investment Fund Contracts and Sale-Leaseback Contracts made investors entirely
dependent on DC Solar to manufacture, operate, maintain and sub-lease their
purported Generators, DC Solar's efforts were essential to the success or failure of
the common enterprise.  Investors also had an expectation of profits from the tax
benefits and payment stream to be generated from the enterprise.

## C.   DC Solar Had Minimal Legitimate Lease Revenue Throughout the Scheme

35.   Lease revenue from end-users of the Generators was material to

investors because it was the purported source of the funds that DC Distribution would use to make lease payments to the Investment Funds and Sale-Leaseback Contract investors. Although DC Distribution purported to be earning millions each month in lease revenue from end-users of the Generators, bank records show that DC Distribution actually received only minimal amounts from end-users. In fact, the vast majority of funds flowing into DC Distribution's bank accounts consisted of transfers of investor funds from DC Solutions.

36. During the period from January 2013 through December 2018, a total of about $409,930,000 was deposited into DC Distribution's bank accounts. Of that amount, approximately $383,347,000 -- or 93.5% -- consisted of transfers from DC Solutions' bank accounts. Another $8,268,000 -- or 2.0% -- consisted of transfers from the bank accounts of different Investment Funds. At most, $18,316,000 -- or 4.5% -- of the deposits to DC Distribution's bank accounts during the time period represented sub-lease payments from end-users of the Generators.

37. But, during this period, DC Distribution paid about $347,800,000 to various Investment Funds and Sale-Leaseback Contract investors, most of which took the form of "lease payments" owed under the operative Equipment Lease Agreements. Accordingly, DC Distribution's payments were not funded by legitimate sub-lease revenue, but instead by investor funds cycled through DC Solutions, a material fact never disclosed to DC Solar's investors.

**D.    Lauer Knowingly or Recklessly Participated in the Fraudulent Scheme**

38. Unbeknownst to investors, most of the lease revenue paid to investors consisted of funds from other investors, rather than lease income from legitimate end-users of the Generators. Lauer knowingly or recklessly took part in hiding these material facts from investors and perpetuating DC Solar's fraud.

### (1)    Lauer Knew About the Lack of Lease Revenue Throughout the Scheme

39. From early in his tenure working with DC Solar, Lauer knew or was

reckless in not knowing that DC Distribution was encountering difficulties in leasing Generators to end-users and that it never earned the amount of lease revenue that it claimed to earn.  Lauer also knew or was reckless in not knowing that in place of actual lease revenue from end-users, DC Solutions used money from new investors to secretly infuse DC Distribution's bank account with cash, and that DC Distribution relied on these regular infusions to make the lease payments it owed under the various Equipment Lease Agreements.

40.    Lauer was aware that as part of the purported mechanism of the investments, investors relied on the lease payments from DC Distribution to make monthly payments to DC Solutions under the terms of the Promissory Notes.  Thus, Lauer knew or was reckless in not knowing that the purported revenue generated from leasing the Generators was of vital importance in the eyes of investors.

41.    Indeed, in February 2014, one of DC Solar's existing investors asked for information about DC Distribution's underlying sub-leases with end-users and the past performance of other Investment Funds because that investor was considering making additional investments with DC Solar.  In response to a question from Lauer about whether payment history for some of the sub-lessees could be provided, Roach sent an email with an attachment containing a table of the payment history of each of DC Distribution's sub-lessees for 2012 and 2013.  Roach stated:  "I don't think you have ever seen this report.  As you can see we only have 5% of the leases from 3rd parties.  That obviously won't work."  The table in the attachment showed that nearly all of the "lease" revenue for DC Distribution in 2012 and 2013 came from DC Solutions.

42.    Lauer responded by noting that Roach was "spot on" with saying that the investor wanted "to see the underlying leases."  Lauer added "[m]y concern in telling [the investor] that we don't have many underlying leases because of the nature of the product etc. is that did we already tell him something to the contrary?"

43.    Roach's response acknowledged that J. Carpoff had misled the investor.

Roach stated: "[y]es.  Jeff told them 80 to 90 percent of the trailers are leased out.  He did not technically say anything that was not true.  But the fact that Solutions is leasing several units has not been disclosed.  Another high wire act on our end."  Roach was referring to the fact that, while the Generators were "technically" leased out, J. Carpoff had omitted to also state to investors that DC Solutions was leasing the vast majority of the Generators, rather than actual end-users, a fact necessary to make his statement not misleading.  Thus, from at least February 2014, Lauer participated in this "high wire act," knowing that DC Solar was hiding from investors the truth that the vast majority of DC Distribution's purported lease revenue came from investor money to make up for the lack of actual end-users.

44.    Lauer remained aware of the continuing trouble DC Distribution had in finding end-users to lease the Generators, and that DC Solutions therefore continued to send regular infusions of investor money to DC Distribution.  For example, on April 29, 2014, Roach copied Lauer, as well as the Carpoffs and Karmann, on an email about the amounts that needed to be transferred so that DC Distribution could make its lease payments to the Investment Funds.

45.    On July 18, 2016, Roach emailed J. Carpoff and Lauer and wrote, "I attached the Distribution Sub Lease activity and a summary analysis of all the activity and the master leases for 2012-2015."  There were five excel spreadsheets attached to the email.  The first four showed the total amount of lease revenue generated by DC Distribution broken down by customer for each year from 2012 through 2015.  The last spreadsheet compared the amount of sub-lease revenue generated by DC Distribution to the amount it owed under the leases it signed with the Investment Funds.  The spreadsheet revealed that DC Distribution made just $2,157,606 from sub-leasing the Generators to end-users from 2012 through 2015, while it owed $57,094,008 to the Investment Funds.

46.    On March 2, 2017, Roach again sent an email to Lauer, amongst others, attaching excel spreadsheets that showed the amounts of sub-lease revenue generated

by DC Distribution from 2013 through 2016.  Roach wrote:

> I attached the DC Solar Distribution sub-lease activity for years 2013-2016.
> The following are the amounts paid by DC Solar Solutions, Inc. to DC Solar
> Distribution, Inc. on a re-rent basis for each of those years:
>
> 2013 - $ 1,595,370
> 2014 -  13,975,770
> 2015 -  30,562,024
> 2016 -  61,545,737

The attached spreadsheets again showed that DC Distribution had generated minimal amounts of sub-lease revenue from end-users of the Generators from 2013 through 2016, and that the vast majority of the money it received came from DC Solutions.

47.     The problems with DC Solar's business model due to the lack of lease revenue was a consistent topic of conversation among those involved in the scheme.  Lauer participated in numerous conversations with Roach, J. Carpoff, and Karmann discussing the lack of lease revenue and/or the need to get new deals done in order to make "lease" payments to prior investors.

### (2)     Lauer Created and Sent Misleading Transaction Documents in Furtherance of the Scheme

48.     Despite his awareness of the lack of lease revenue, Lauer continued to commit deceptive acts and assist others in committing deceptive acts throughout his tenure working for DC Solar.  From the time he began working for DC Solar until the implosion of the fraudulent scheme, Lauer was the primary counsel for DC Solar in its dealings with investors.  He drafted the deal documents for every Investment Contract that DC Solar sold, including the Investment Fund Contracts, the Sale Leaseback Contracts, and the underlying leases between DC Distribution and the end-users of the Generators.

49.     Among the documents that Lauer drafted and then provided to investors in the various transactions were the Equipment Leases.  In those Equipment Leases,

DC Distribution committed to paying "Base Rent" as well as "Additional Rent" or "Variable Rent." The Equipment Leases misleadingly omitted that any "Base Rent," "Additional Rent," or "Variable Rent" payments due to investors were contingent on DC Solutions raising money from new investors because DC Distribution was generating virtually no lease revenue from sub-leases with end-users. Lauer knew that the Equipment Leases would deceive investors because he knew that DC Distribution was generating minimal amounts of legitimate lease revenue from end-users.

50.     Information about the amount of lease revenue being generated by DC Distribution was critical to investors. Investors would not have invested money if they had known that the purported lease payments came from new investors contributing money into the scheme rather than from real end-user lease revenue.

51.     Lauer knew or was reckless in not knowing from at least February 2014 that DC Distribution was only earning a tiny fraction of the lease revenue that it claimed to be earning. Yet, from that time, Lauer continued to draft deal documents and engage in deceptive communications with investors and prospective investors resulting in investments worth over $2.5 billion.

### (3)    Lauer Knowingly or Recklessly Provided Misleading Lease Information to Investors

52.     Lauer repeatedly deceived prospective investors in countless meetings, emails, and calls while cloaked with the credibility of acting as DC Solar's external counsel. Lauer deceived investors when discussing the terms and structure of deals, drafting the various agreements for the deals, and pretending that DC Solar was a genuine and successful business. In particular, Lauer never informed investors about the lack of lease revenue, but instead provided fraudulent information to current and prospective investors concerning purported leasing arrangements with end-users that he knew to be false and misleading.

53.     In one instance, Lauer sent a prospective investor ("Company 1") an

"Estoppel Certificate" concerning a purported lease agreement between DC Distribution and an end-user ("Lessee 1") of certain of the Generators. Company 1 was considering an investment in which it would purchase the Generators that were purportedly leased to Lessee 1. On its face, the Estoppel Certificate provided Company 1 with certain warrants and representations from Lessee 1 that, among other things, certified that Lessee 1 had timely and fully paid its lease obligations of *$1.1 million per month* for the past two years, and would continue to make such payments for the next 10 years pursuant to the lease.

54.     At the time Lauer provided the Estoppel Certificate to Company 1, he knew or was reckless in not knowing that Lessee 1 had not actually paid $1.1 million per month in lease payments for the past two years. In fact, just two months prior, Lauer received information from Roach showing that Lessee 1 had paid a total of about *$1 million over the course of four years*. However, rather than inform Company 1 about the true amount received, Lauer knowingly or recklessly provided Company 1 with a false Estoppel Certificate, leading Company 1 to believe that Lessee 1 had paid over $13 million each year for the past two years. Company 1 thereafter entered into an investment with DC Solar worth over $34 million.

55.     After Company 1 finalized its $34 million investment, J. Carpoff wired $500,000 to Lauer as a reward for his part in successfully tricking Company 1 into investing millions of dollars.

56.     Lauer was also instrumental in drafting the documents for another end-user ("Lessee 2"). DC Solar touted the Lessee 2 lease agreements with several investors, claiming Lessee 2 had agreed to lease hundreds of Generators for a term of 10 years. At least three investors entered into Investment Contracts after DC Solar represented that Lessee 2 would be the end-user leasing the Generators that the investors would purchase as part of their investments. In addition to the lease agreements, DC Solar had several sponsorship and marketing agreements with Lessee 2, through which DC Solar paid millions each year to Lessee 2. The amount that DC

Solar paid in sponsorship was far greater than the amount Lessee 2 owed each month in lease payments. However, unbeknownst to investors, Lessee 2 and DC Distribution had also executed an addendum to each lease agreement allowing Lessee 2 to terminate the lease after 5 years or at any time should DC Solar discontinue any of the sponsorship or marketing agreements. Lauer helped draft and reviewed drafts of the addenda, but hid the actual facts and substances of the addenda from current and prospective investors.

57.     For example, when an investor ("Company 2") was considering an investment with DC Solar, Lauer was a key contact with Company 2. Company 2's investment involved purchasing Generators that would then be sub-leased to Lessee 2. During the days leading up to the closing of the investment, Company 2 emailed Lauer a series of documents to review and asked to be informed if any changes needed to be made. Among the documents was a "Subleasing Consent and Amendment," whereby DC Distribution would agree, among other things, with respect to its sublease with Lessee 2, not to modify the time for payment or to waive performance in any material respect without the express prior written consent of Company 2. Based upon a form sub-lease with Lessee 2 that Lauer had provided to Company 2, Company 2 believed the term of the sub-lease with Lessee 2 was 10 years.

58.     The following day, Lessee 2 emailed Lauer a draft of an addendum to the sublease between DC Distribution and Lessee 2, noting "Here is a draft of the Addendum #1 to the sublease for your review. It should look very similar to the previous addendums." The attached addendum permitted Lessee 2 to terminate the lease after 5 years, or at any time should DC Solar default on any of its sponsorship agreements with Lessee 2. Lauer knew or was reckless in not knowing that Company 2 was not aware of the terms of the Addendum, which permitted Lessee 2 to terminate the lease and intentionally withheld this material change to the agreement from Company 2.

59.     The Subleasing Consent and Amendment from Company 2 included an "Acknowledgment" to be signed by Lessee 2, which provided that Lessee 2 would not modify its sub-lease with DC Distribution without Company 2's written consent. However, as Lauer knew or was reckless in not knowing, Lessee 2 refused to sign the Acknowledgment because it was concerned that it would need Company 2's approval for the rights already provided to Lessee 2 under the terms of Addendum #1.

60.     Because Lauer and DC Solar intended to hide the terms of Addendum #1 from Company 2, Lauer misrepresented to Company 2 that Lessee 2 would not sign the Acknowledgment because Lessee 2's position was that "their business relationship is with DC Solar, not [Company 2]."  In the end, Lauer convinced Company 2 to settle for a letter from Lessee 2 stating that it was sub-leasing the Generators that Company 2 was leasing to DC Distribution.  Lauer never told Company 2 the true reason that Lessee 2 refused to sign the Acknowledgment.  Lauer also never told Company 2 that Lessee 2 could terminate the sub-lease after 5 years or at any time if DC Solar defaulted on its sponsorship agreements with Lessee 2. Subsequent to the finalization of Company 2's investment, J. Carpoff paid Lauer another $500,000 for his role in securing the investment.

61.     Similarly, when another investor ("Company 3") was considering an investment where it would purchase Generators that Lessee 2 would sub-lease, Lauer was one of the main contacts in answering questions from and providing information to this prospective investor.  Company 3 had certain questions about the lease with Lessee 2 and emailed Lauer a copy of the lease with certain portions high-lighted, including a provision that indicated that the term of the lease was 10 years long. Notwithstanding that Company 3 specifically pointed Lauer to the length of the lease, Lauer knowingly or recklessly withheld information about the Addendum, which allowed Lessee 2 to terminate the lease after 5 years or at any time should DC Solar stop its sponsorship agreements with Lessee 2.

62.     In addition, similar to Company 2, Company 3 also sent Lauer a "Notice

and Acknowledgment of Collateral Assignment," which provided that Lessee 2 would acknowledge and agree that it had irrevocably accepted the Generators for sub-lease and that the term of the sub-lease was 10 years.  Lessee 2 refused to sign the document.  In turn, Lauer misrepresented to Company 3 that Lessee 2 would not sign the document because "[t]heir position is their relationship is with DC Solar…" Lauer never told Company 3 the true reason why Lessee 2 refused to sign the document because Lauer and DC Solar wanted to hide the actual terms of the Addendum from Company 3.  In the end, Lauer sent Company 3 a copy of the finalized sub-lease between DC Distribution and Lessee 2, but knowingly or recklessly withheld the Addendum that modified the terms of the sub-lease.

63.    Lauer's deceptive acts perpetuated the fraudulent scheme for years. Both new and existing investors purchased additional Investment Fund Contracts or Sale-Leaseback Contracts during the period in which he falsely touted DC Solar's business and fraudulently papered the deals.

64.    While investors were brazenly defrauded, Lauer profited handsomely from his part in the DC Solar scheme.  Between January 2013 and December 2018, Lauer received approximately $4.4 million in ill-gotten gains.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection With the Sale of Securities
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder

65.    The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

66.    Defendant Ari J. Lauer, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

      a.    employed devices, schemes, or artifices to defraud;

b.   made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

67.   By engaging in the conduct described above, Defendant Ari J. Lauer violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Fraud in the Offer and Sale of Securities
Violations of Section 17(a) of the Securities Act**

68.   The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

69.   Defendant Ari J. Lauer, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

a.   with scienter, employed devices, schemes, or artifices to defraud;

b.   obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

70.   By engaging in the conduct described above, Defendant Ari J. Lauer violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

COMPLAINT                                                      19

1
2
3

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act
and Rule 10b-5(b) Thereunder**

4
5

71.    The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

6
7
8
9
10

72.    By engaging in the conduct described above, Defendant Ari J. Lauer knowingly or recklessly provided substantial assistance that aided and abetted, pursuant to Section 20(e) of the Exchange Act, J. Carpoff's and Paulette Carpoff's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

11
12
13
14

73.    By engaging in the conduct described above, Defendant Ari J. Lauer aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

15
16
17

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting
Violations of Section 17(a)(2) of the Securities Act**

18
19

74.    The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

20
21
22
23

75.    By engaging in the conduct described above, Defendant Ari J. Lauer knowingly or recklessly provided substantial assistance that aided and abetted, pursuant to Section 20(e) of the Exchange Act, J. Carpoff's and Paulette Carpoff's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

24
25
26

76.    By engaging in the conduct described above, Defendant Ari J. Lauer aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

27
28

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendant, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### **II.**

Order Defendant to disgorge all ill-gotten gains he received, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15. U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### **III.**

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### **IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

1

## V.

2      Grant such other and further relief as this Court may determine to be just and

3  necessary.

4     Dated:  September 30, 2022

5                                                            /s/ Dean M. Conway
                                                         _____
6                                                         Dean M. Conway
                                                         Sarra Cho
7                                                         Attorneys for Plaintiff
                                                         Securities and Exchange Commission
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28