DEAN M. CONWAY *(counsel for service)*
Email:  conwayd@sec.gov
SARRA CHO
Email:  chosa@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4412
Facsimile: (202) 772-9245

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>ARI J. LAUER,<br><br>　　　　　Defendant. | Case No. 2:22-cv-01726-DAD-DB<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT ARI J. LAUER'S MOTION TO DISMISS**<br><br>Date:　　April 4, 2023<br>Time:　　1:30 p.m.<br>Ctrm:　　4 |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND ...........................................................................................2

III.    ARGUMENT ...............................................................................................6

      A.      The Complaint States Plausible Claims ...............................................6

            1.      Lauer Engaged in a Fraudulent or Deceptive Scheme...............6

                  a.      The Applicable Law ...............................................6

                  b.      The Commission's Allegations Are Sufficient ...............7

            2.      Lauer Made Material Misrepresentations and Omissions and, Alternatively, Aided and Abetted the Carpoffs' Fraud ............7

                  a.      The Applicable Law ...............................................7

                  b.      The Commission's Allegations are Sufficient................8

      B.      The Complaint Sufficiently Alleges Facts Establishing Securities .....9

            1.      Investment of Money .................................................10

            2.      Common Enterprise .................................................10

            3.      Expectation of Profit from the Efforts of Others .....................12

      C.      Lauer Is Not Shielded From Liability For His Fraudulent Conduct Simply Because He Is A Lawyer .......................................................13

            1.      Lauer Engaged in Deceptive Scheme to Induce Investors to Enter into Lease Agreements and Was Not Merely Providing Legal Services.................................................16

            2.      Lauer Obtained Money Related to His Role in the Fraudulent Scheme .................................................17

            3.      Lauer Is Liable for Aiding Abetting DC Solar's Fraud...........18

IV.     CONCLUSION.................................................19

1

## <u>TABLE OF AUTHORITIES</u>

2

### <u>CASES</u>

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................6

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................6

*Bentel v. United States,*
    13 F.2d 327 (2d Cir. 1926) ...................................................17

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) ..............................................19

*In re Gilead Sciences Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008)...............................................6

*Janus Capital Group, Inc. v. First Derivative Traders,*
    564 U.S. 135 (2011)................................................................8

*Johnson v. Riverside Healthcare System, LP,*
    534 F.3d 1116 (9th Cir. 2008) ..............................................6

*Kolibash v. Sagittarius Recording Co.,*
    626 F. Supp. 1173 (S.D. Ohio 1986) ...................................13

*Levine v. Diamanthuset, Inc.,*
    950 F.2d 1478 (9th Cir. 1991) ..............................................18

*Long v. Shultz Cattle Co.,*
    881 F.2d 129 (5th Cir. 1989) ................................................13

*Neuder v. Batte/le Pac. N. W Nat. Lab.,*
    194 F.R.D. 289 (D.D.C. 2000) .............................................14

*SEC v. Apuzzo,*
    689 F.3d 204 (2d Cir. 2012) ..................................................8

*SEC v. DiBella,*
    587 F.3d 553 (2d Cir. 2009) ..................................................8

*SEC v. Edwards,*
    540 U.S. 389 (2004)..............................................................10

*SEC v. Frank,*
    388 F.2d 486 (2d Cir. 1968) ................................................17

*SEC v. Goldfield Mines Co. of Nevada,*
    758 F.2d 459 (9th Cir. 1985) .................................11, 12, 13

*SEC v. Nationwide Automated Sys. Inc.,*
    2014 WL 12811969 (C.D. Cal. 2014) .................................10

*SEC v. R.G. Reynolds Enter., Inc.,*
   952 F.2d 1125 (9th Cir. 1991) ................................................................ 11

*SEC v. W.J. Howey Co.,*
   328 U.S. 293 (1946) .......................................................................... 1, 9

*United States v. Blackman,*
   72 F.3d 1418 (9th Cir. 1995) ................................................................ 15

*United States v. Dakota,*
   197 F.3d 821 (6th Cir. 1999) ................................................................ 14

*United States v. Graf,*
   610 F.3d. 1148 (9th Cir 2010) .............................................................. 14

*United States v. Sanmina Corp.,*
   968 F.3d 1107 (9th Cir. 2020) .............................................................. 15

*United States v. Zolin,*
   491 U.S. 554 (1989) ............................................................................ 15

## FEDERAL STATUTES

### Securities Act of 1933

Section 15(b)
   [15 U.S.C. § 77o(b)] ............................................................................ 8

Section 17(a)(1)
   [15 U.S.C. § 77q(a)(1)] ........................................................................ 6

Section 17(a)(2)
   [15 U.S.C. § 77q(a)(2)] ..................................................................... 8, 9

Section 17(a)(3)
   [15 U.S.C. § 77q(a)(3)] ........................................................................ 6

Section 2(a)(1)
   [15 U.S.C. § 77b(a)(1)] ........................................................................ 9

### Securities Exchange Act of 1934

Section 10(b)
   [15 U.S.C. § 78j(b)] ...................................................................... 6, 7, 9

Section 20(e)
   [15 U.S.C. § 78t(e)] ............................................................................. 8

Section 3(a)(10)
   [15 U.S.C. § 78c(a)(1)] ........................................................................ 9

## FEDERAL REGULATIONS

Rule 10b-5(a)
   [17 C.F.R. § 240.10b-5(a)] .................................................................... 6

Rule 10b-5(b)
    [17 C.F.R. § 240.10b-5(b)] ................................................................7, 9

Rule 10b-5(c)
    [17 C.F.R. § 240.10b-5(c)] ................................................................6

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(b)(6) .........................................................................6

# I.   **INTRODUCTION**

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission") opposes Defendant Ari J. Lauer's Motion to Dismiss (the "Motion"). ECF No. 9.  Lauer's Motion by and large seeks dismissal of the Commission's Complaint based on arguments that no security was involved and that his misconduct was shielded by the attorney-client privilege.  Both arguments are wrong.

First, Lauer incorrectly contends that the allegations of the Complaint do not satisfy the elements of *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  In that case, the Supreme Court defined an investment contract to require: (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of others.  This definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Id.* at 299.

Here, the allegations of the Complaint regarding DC Solar's massive securities fraud easily meet each element of this standard: (i) investors provided money to DC Solutions, an affiliate of DC Solar, for investment purposes, namely the earning of significant tax credits and additional revenue from DC Distribution's leasing of mobile solar generators ("Generators"); (ii) a common enterprise existed because the fortunes of the investors were tied to those of DC Solar's, which depended on the profits derived from DC Distribution's leasing of the Generators; and (iii) the success of the enterprise was entirely dependent on the efforts of DC Solar to manufacture and lease the Generators—whether the enterprise succeeded or failed had nothing to do with investor efforts.

Second, Lauer did not merely act as legal counsel preparing transactional documents for a client but rather was a key and knowing participant in DC Solar's wide-ranging fraud.  Lauer was aware from at least February 2014 that the company was only earning a tiny fraction of the lease revenue that it claimed to be earning.

Yet, from that time, Lauer continued to draft fraudulent deal documents and misleadingly communicated with investors and prospective investors in order to induce them to invest.  As such, he is not shielded from liability simply by claiming attorney-client privilege.  To the contrary, his misconduct clearly falls within the ambit of the crime-fraud exception and he will also bear—not the SEC—the burden of proving that the attorney-client privilege applies, which is fact intensive and not appropriately decided at this stage.

Lauer's other arguments are equally unavailing.  As a result of his substantial participation in DC Solar's fraud, Lauer received over $4,000,000, which constituted ill-gotten gains and did not represent compensation for the provision of legitimate legal services.  The Commission also has adequately alleged that Lauer aided and abetted the violations of others who orchestrated DC Solar's fraud though his misconduct.  Accordingly, Defendant's Motion should be denied in its entirety.

## II.   **BACKGROUND**

The Commission's Complaint alleges that Lauer violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") related to his participation in a massive Ponzi scheme that defrauded investors out of over $910 million.  ECF No. 1 ("Compl.") ¶ 4.  With the help of Lauer and others, Jeffrey Carpoff and Paulette Carpoff orchestrated the years-long scheme by offering investment opportunities through their privately held alternative energy companies, DC Solar Solutions, Inc. ("DC Solutions") and DC Solar Distribution, Inc. ("DC Distribution") (collectively, with the Carpoffs, "DC Solar").  *Id.* ¶¶ 4-5, 17.  As part of the investment, investors purchased Generators from DC Solutions and then immediately leased them to DC Distribution, which then supposedly sub-leased them to end-users.  *Id.* ¶ 5.  The sub-lease revenue was critical to the success of the investments because it was the purported source of the funds that DC Distribution would use to make lease payments to investors.  *Id.* ¶ 35.  But, unbeknownst to investors, thousands of the Generators

1    that they purchased were never even manufactured, let alone leased out.  *Id.* ¶ 6.

2    Moreover, the vast majority of alleged sub-lease "revenue" came from investor

3    money, and not from actual lease payments from end-users of the Generators.  *Id.* ¶ 6.

4    Most of the lease revenue paid to investors consisted of funds from other investors,

5    rather than lease income from legitimate end-users.  *Id.* ¶ 38.

6        From early on and throughout the scheme, Lauer was aware that DC

7    Distribution never earned the amount of lease revenue that it claimed to earn.  *Id.* ¶

8    39.  Lauer also knew that in place of actual lease revenue from end-users, DC

9    Solutions used money from new investors to secretly infuse DC Distribution's bank

10   account with cash, which DC Distribution relied on to make lease payments to

11   investors.  *Id.* ¶ 39.  He participated in numerous conversations with the Carpoffs and

12   other insiders discussing the need to get new deals done in order to make "lease"

13   payments to prior investors.  *Id.* ¶ 47.  Lauer was also aware that Jeffrey Carpoff had

14   lied to investors about the vast majority of the Generators being leased out to end-

15   users, when in reality the purported lease revenue came from new investor money.

16   *Id.* ¶ 43.  Lauer knowingly took part in hiding these facts from investors because he

17   was aware that the purported revenue from end-users was of vital importance in the

18   eyes of investors.  *Id.* ¶¶ 38, 40.

19       Despite his awareness of the lack of lease revenue, Lauer continued as the

20   primary counsel for DC Solar in its dealings with investors.  *Id.* ¶ 48.  He drafted the

21   deal documents for each of the two types of investment contracts offered by DC Solar

22   —the Investment Fund Contracts and the Sale-Leaseback Contracts.  *Id.* ¶ 48.  Under

23   both types of investment contracts, investors purchased Generators from DC

24   Solutions, and simultaneously leased them to DC Distribution.  *Id.* ¶¶ 17, 20, 23-24.

25   DC Distribution would then purportedly sub-lease the Generators to end-users.  *Id.* ¶

26   17.  Investors in the Investment Fund Contracts executed a standard set of agreements

27   that Lauer drafted, which included a Limited Liability Company Agreement, a Solar

28   Equipment Purchase Agreement, a Secured Promissory Note, and a Mobile Solar

OPPOSITION TO MOTION
TO DISMISS
                        3

Equipment Lease. *Id.* ¶¶ 7, 20-26, 48-51. Similarly, investors in the Sale-Leaseback Contracts typically executed a standard set of agreements that Lauer drafted, including a Sale Agreement, an Equipment Lease Agreement, and a Schedule. *Id.* ¶¶ 7, 28, 48-51. Although Lauer drafted the various lease agreements for the Investment Fund Contracts and the Sale-Leaseback Contracts and often provided them directly to investors, he misleadingly omitted that the lease payments came from new investor money because DC Distribution was earning so little from actual end-users. *Id.* ¶ 49.

Lauer repeatedly deceived prospective investors in meetings, emails, and calls while cloaked with the credibility of DC Solar's external counsel. *Id.* ¶ 52. He deceived them when discussing the terms and structure of deals, drafting the various agreements for the deals, and pretending that DC Solutions and DC Distribution were genuine and successful businesses. *Id.* ¶ 52. For every investor and for every investment, he never informed them about the lack of lease revenue. *Id.* ¶ 52. Instead, he provided investors with fraudulent information about purported leasing arrangements with end-users that he knew to be false and misleading because he knew the purported revenue was coming from new investors. *Id.* ¶¶ 49, 52.

In addition, in one instance, Lauer provided an Estoppel Certificate to an investor ("Company 1"), which warranted that a certain end-user had timely and fully paid its lease obligations on the Generators of $1.1 million per month for the past two years, and would continue to make such payment for the next 10 years pursuant to the lease. *Id.* ¶ 53. But Lauer knew from information he received just two months prior that that end-user had paid only $1 million total over the past 4 years. *Id.* ¶ 54. Company 1 thereafter entered into an investment with DC Solar worth over $34 million. *Id.* ¶ 55. Jeffrey Carpoff wired $500,000 to Lauer as a reward for his part in successfully tricking the investor. *Id.* ¶ 55.

In another instance, Lauer lied to a prospective investor ("Company 2") in order to complete the investment. *Id.* ¶¶ 56-60. Company 2 was told that the end-user ("Lessee 2") for the Generators that it was purchasing had entered into a 10 year

OPPOSITION TO MOTION
TO DISMISS                                    4

1   lease for the Generators. *Id.* ¶ 57. However, DC Solar had sponsorship agreements

2   with Lessee 2, in which DC Solar paid sponsorship fees that were far greater than

3   what Lessee 2 owed in lease payments. *Id.* ¶ 56. Unbeknownst to Company 2,

4   Lessee 2 and DC Distribution had also executed an addendum to the lease agreement

5   allowing Lessee 2 to terminate the lease after 5 years, or at any time if DC Solar

6   discontinued the sponsorship agreements. *Id.* ¶ 56. When Company 2 requested

7   through Lauer that Lessee 2 sign an Acknowledgement that it would not modify the

8   lease without Company 2's consent, Lessee 2 refused because of the terms of the

9   secret addendum. *Id.* ¶ 59. Lauer, wanting to hide the addendum from Company 2,

10   lied to Company 2 and told it that Lessee 2 would not sign the acknowledgment

11   because Lessee 2's position was that "their business relationship is with DC Solar,

12   not [Company 2]." *Id.* ¶ 60. After the investment was finalized, Jeffrey Carpoff

13   rewarded Lauer with $500,000 for his role. *Id.* ¶ 60.

14       Similarly, when another investor ("Company 3") was considering an

15   investment involving Generators that Lessee 2 would sub-lease, Company 3 had

16   certain questions about Lessee 2's sub-lease and emailed Lauer a copy of the lease

17   with certain portions high-lighted, including the lease term of 10 years. *Id.* ¶ 17.

18   Lauer never told Company 3 about the secret addendum that permitted Lessee 2 to

19   terminate the lease after 5 years or at any time should DC Solar discontinue the

20   sponsorship agreements. *Id.* ¶ 61. Instead, when Company 3 sent Lauer a "Notice

21   and Acknowledgment of Collateral Assignment," which provided that Lessee 2

22   would acknowledge and agree that it had irrevocably accepted the Generator sub-

23   lease for 10 years, Lauer lied to Company 3 as to why Lessee 2 refused to sign it,

24   falsely claiming that "[t]heir position is their relationship is with DC Solar." *Id.* ¶ 62.

25       As a result of the conduct alleged in the Complaint, Lauer violated the

26   antifraud provisions of the Securities Act and the Exchange Act. The Complaint also

27   alleges that he aided and abetted Jeffrey Carpoff's and Paulette Carpoff's antifraud

28   violations, for which they have settled actions with the Commission and also for

1  which they are currently serving 30 years and 11 years, respectively, in federal prison

2  pursuant to parallel criminal actions.  *Id.* ¶¶ 8, 10-11.

3  **III.   ARGUMENT**

4          Dismissal under Rule 12(b)(6) is proper only where there is a "lack of

5  cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable

6  legal theory." *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121–22

7  (9th Cir. 2008).  In reviewing a motion to dismiss under Rule 12(b)(6), a court must

8  accept as true all material allegations in the complaint, as well as all reasonable

9  inferences to be drawn from them, construing the complaint in the light most

10  favorable to the plaintiff.  *See, e.g., In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049,

11  1055 (9th Cir. 2008).  A "complaint must contain sufficient factual matter, accepted

12  as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

13  U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547

14  (2007)).  A claim is facially plausible when the factual allegations permit "the court

15  to draw the reasonable inference that the defendant is liable for the misconduct

16  alleged." *Id.*

17          **A.     The Complaint States Plausible Claims**

18          Here, each of the Commission's claims meets the standards above, and states

19  plausible claims on their face.

20                  **1.     Lauer Engaged in a Fraudulent or Deceptive Scheme**

21                          **a.     The Applicable Law**

22          Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) prohibit any

23  person from employing "any device, scheme, or artifice to defraud" or engaging in

24  any "act, practice, or course of business" which operates as a fraud or deceit, in

25  connection with the purchase or sale of a security.  Similarly, Sections 17(a)(1) and

26  (a)(3) of the Securities Act prohibit any person from, in the offer or sale of a security,

27  employing "any device, scheme, or artifice to defraud" or engaging in any

28  "transaction, practice, or course of business" which operates as a fraud or deceit.

OPPOSITION TO MOTION
TO DISMISS                                    6

### b.    The Commission's Allegations Are Sufficient

The Commission has sufficiently alleged that Lauer engaged in a fraudulent and deceptive scheme.  As alleged in the Complaint, Lauer was an integral part of the scheme from early on as one of the main insiders and architects of this scheme.  *Id.* ¶¶ 7, 39.  Although he was well aware of the lack of actual lease revenue and that new investor money was used to pay investors, he continued to participate in and help perpetuate the fraud for years.  *Id.* ¶¶ 7, 39.  Having participated in numerous conversations with other insiders to the fraud where they discussed the need to get new investment deals done in order to make "lease" payments to prior investors, he knew the importance of procuring new investors to the scheme.  *Id.* ¶¶ 47, 50.  To that end, he drafted the various Equipment Leases for each of the Investment Fund Contracts and the Sale-Leaseback Contracts that created the false appearance that DC Distribution could generate sufficient sub-lease revenue to make lease payments.  *Id.* ¶¶ 48-52.  In numerous interactions with investors and prospective investors, Lauer helped perpetuate the illusion that DC Distribution was earning millions in sub-lease revenue each month, and worked to conceal that it was actually new investor money funding the lease payments rather than actual end-users.  *Id.* ¶ 52.  In addition, there are at least several instances where Lauer specifically lied to prospective investors about the sub-leasing arrangements with Lessee 2 and hid the secret addendums to the sub-leases.  *Id.* ¶¶ 56-62.  Lauer knowingly was a crucial and integral part of the fraud, as the lawyer who drafted the deal documents, and interacted and negotiated directly with prospective investors.  *Id.* ¶ 63.  Lauer was critical to the success of the scheme, which duped investors out of over $910 million. *Id.* ¶¶ 4, 27, 32.

### 2.    Lauer Made Material Misrepresentations and Omissions and, Alternatively, Aided and Abetted the Carpoffs' Fraud

### a.    The Applicable Law

Section 10(b) of the Exchange Act and Rule 10b-5(b) prohibit any person from "making any untrue statement of a material fact" or "omit[ting] to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of a security.  For purposes of Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  Section 17(a)(2) of the Securities Act prohibits any person from in the offer or sale of a security, "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

Aiding and abetting liability, pursuant to Securities Act Section 15(b) and Exchange Act Section 20(e), attaches to any person that knowingly or recklessly "provides substantial assistance to another person in violation of [the particular Act, or of any rule thereunder]."  To establish aiding and abetting liability, the Commission must show:  "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012) (citing *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).

### b.    The Commission's Allegations are Sufficient

On numerous occasions, the Complaint alleges that Lauer made untrue statements and omitted material facts in investor communications that were necessary to make statements made to investors and prospective investors not misleading. Lauer was aware throughout the scheme that DC Distribution made very little sub-lease revenue and that DC Solutions infused it with money from new investors to pay prior investors.  Compl. ¶¶ 7, 38-47.  He also knew that Jeffrey Carpoff had lied to prospective investors by telling them that "80 to 90 percent" of the Generators were sub-leased. *Id.* ¶ 43.  Despite his knowledge of the fraud, Lauer misleadingly omitted

that DC Distribution would use new investor money to fund the lease payments in all of the deal documents that he drafted. *Id*. ¶¶ 42-43, 48-51. In numerous meetings, calls, and other communications in which he spoke directly with prospective investors about the leases and sub-leases, he never told them that DC Distribution's actual sub-leases were a tiny fraction of what investors were told they were, nor did he tell them that the lease payments to investors were funded by new investor money. *Id*. ¶¶ 52-64. Instead, Lauer lied to investors. *Id*. ¶¶ 52-64. Rather than telling investor's truth about Lessee 2's secret addendums with DC Solar that gave it several ways to cancel the sub-leases, he lied to at least two investors when he told them that Lessee 2 would not sign certain documents because Lessee 2 only had a direct relationship with DC Solar. *Id*. ¶¶ 56-62. On at least two occasions, Lauer obtained money in the form of two $500,000 bonuses by means of his lies and omissions to secure investments in violation of Section 17(a)(2). *Id*. ¶¶ 55, 60.

Alternatively, Lauer aided and abetted J. Carpoff's and P. Carpoff's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and Securities Act Section 17(a)(2) by providing substantial assistance in keeping the scheme afloat. *Id*. ¶ 68. As alleged in the Complaint, Lauer was well aware of the fraudulent scheme, as he took part in numerous discussions with the Carpoffs and other insiders concerning it. *Id*. ¶¶ 7, 42-43, 47. The Complaint alleges that Lauer provided substantial assistance to the scheme by drafting all of the deal documents and participating in discussions with investors that misled them about the true nature of the business and amount of legitimate lease revenue. *Id*. ¶¶ 7, 38-64. He helped to perpetuate the scheme by lying to investors concerning sub-leasing arrangements. *Id*. ¶¶ 56-62.

## B.     The Complaint Sufficiently Alleges Facts Establishing Securities

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include "investment contracts." In *Howey*, 328 U.S. at 298-99, the Supreme Court defined an investment contract to require: (1) the investment of

1  money; (2) in a common enterprise; (3) with an expectation of profits to be derived

2  solely from the efforts of others.  As alleged in the Complaint, the Investment Fund

3  Contracts and Sales-Leaseback Contracts are securities in the form of investment

4  contracts because they satisfy each prong of the *Howey* test.

### 1.  Investment of Money

6  First, they involve an investment of money.  The Complaint alleges that 17

7  investors paid DC Solar about $910 million to invest in the Investment Fund

8  Contracts and the Sales-Leaseback Contracts.  Compl. ¶¶ 18, 27, 32. Investors

9  provided money to DC Solar for investment purposes—the earning of significant tax

10  credits and additional revenue—and not because they were in the business of

11  operating Generators.  *Id.* ¶¶ 17, 21-22, 24-25.

12  Defendant's Motion contends that the Investment Fund Contracts and the

13  Sales-Leaseback Contracts were comprised of three separate transactions, and

14  therefore are not securities.  *See* Mot. 3-4. This argument fails.  The Complaint

15  alleges that investors executed a standard package of agreements as part of their

16  investments, that were designed to be taken together and not as separate transactions.

17  Compl. ¶¶ 20-25, 28-31.  *See SEC v. Edwards*, 540 U.S. 389, 397 (2004) (holding

18  sale and leaseback scheme involving package of agreements for sale and leaseback of

19  payphones and promising a fixed rate of return is an investment contract); *SEC v.*

20  *Nationwide Automated Sys. Inc.*, 2014 WL 12811969 at *6 (C.D. Cal. 2014) (with

21  respect to a scheme involving "standard package of agreements for a sale-leaseback

22  contract," finding "the sale-and-leaseback contracts for ATM machines at issue in the

23  present case are 'investment contracts' under the Securities Act").  Indeed, the

24  benefits and profits for which investors entered into the investments were contingent

25  upon all of the agreements being executed and in force.

### 2.  Common Enterprise

27  Second, the Investment Fund Contracts and Sale-Leaseback Contracts are

28  investments in a common enterprise.  In the Ninth Circuit, "[t]he second prong of

*Howey* requires either an enterprise common to an investor and the seller, promoter, or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)." *SEC v. R.G. Reynolds Enter., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991). "Vertical commonality may be established by showing 'that the fortunes of the investors are linked with those of the promoters.'" *Id.* (citing *SEC v. Goldfield Mines Co. of Nevada*, 758 F.2d 459, 463 (9th Cir. 1985)). Here, vertical commonality is present because, as alleged in the Complaint, the terms of the Investment Fund Contracts and Sale-Leaseback Contracts tied the fortunes of the investors to those of DC Solar. The ability of investors to receive lease payments and the ability of DC Distribution to meet its lease payment obligations to investors were dependent on DC Distribution generating sub-lease revenue at optimal rates from end-users. Compl. ¶¶ 22-26, 30-31, 34. Moreover, the ability of investors in the Investment Fund Contracts to make payments on the Promissory Notes and DC Solutions' likelihood of receiving those payments were both tied to DC Distribution being able to generate sufficient revenue from sub-leasing the Generators. Compl. ¶¶ 22-26, 34. In addition, the Complaint alleges the amounts and apportionment of any excess lease revenue between investors and DC Solar was contingent upon DC Distribution being able to lease Generators to end-users in amounts greater than its set monthly payments due to investors. Compl. ¶¶ 23-24, 26, 30-31.

Defendant's Motion contends that the investors' fortunes were not linked to those of DC Solar, since DC Solutions made money by selling solar generators to third parties, whether "investors leased the generators or not." But this belies the facts of what actually happened and the design of the investments. Investors were the third parties buying the Generators, and only purchased them as part of the Investment Fund Contracts and the Sale-Leaseback Contracts. None of the investors were in the business of operating or leasing Generators themselves, so DC Solar was only able to sell the Generators as part of the Investment Fund Contracts and the Sale-Leaseback Contracts. The Motion further contends that investors could make

money and DC Distribution could make or lose money, or that investors could themselves sub-lease the Generators to end-users. But the investors were not in the business of sub-leasing Generators and were wholly dependent upon DC Distribution to sub-lease the Generators. The fortunes of DC Distribution were similarly tied to its ability to sub-lease the Generators. As the Complaint alleges, the inter-woven nature of the investments was intentionally structured such that the two privately-held companies that were owned and managed by the Carpoffs would be responsible for manufacturing and selling the Generators and purportedly sub-leasing them to end-users. Compl. ¶¶ 5, 17, 21, 23-25, 28-31. Thus, by design, the success of DC Solar and investors were inextricably intertwined. In fact, Lauer himself participated in numerous discussions about the need to enter into more deals in order to satisfy the lease obligations back to investors.

### 3. Expectation of Profit from the Efforts of Others

Third, the Complaint alleges that the Investment Fund Contracts and the Sale-Leaseback Contracts created an expectation of profits to be derived solely from the efforts of others. This requirement is satisfied if "the efforts made by those other than the investors are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Goldfield Mines Co.*, 758 F.2d at 464. Here, the success of the enterprise was entirely dependent on DC Solar. DC Solutions was responsible for manufacturing the Generators and DC Distribution was responsible for sub-leasing the Generators to end-users in order to ensure that the investors qualified for tax credits and that sufficient revenue was generated in order for investors to receive lease payments and additional profits. Compl. ¶¶ 5, 17, 21, 23-26, 30-31. Indeed, investors played an entirely passive role and the success or failure of the enterprise had nothing to do with the efforts of the investors. The Motion contends that the third element is not satisfied here because investors had to make certain "decisions" in the event that DC Distribution breach its obligations. However, as alleged in the Complaint, investors relied on the efforts of DC

1  Distribution to sub-lease the Generators, as that was the whole point in immediately
2  leasing all of the Generators to DC Distribution in the first place.  The investors were
3  not in the business of manufacturing or leasing Generators; thus they relied on DC
4  Solar to do so.  Compl. ¶ 5.  In fact, DC Solar touted itself to prospective investors as
5  a major player in the industry, with thousands of Generators in the field, lucrative
6  lease agreements yielding a track record of consistent revenue, and extensive
7  experience in making and maintaining the Generators and finding customers for
8  them.  Compl. ¶ 5.

9         Finally, the "expectation of profits" requirement also is satisfied here because
10 the investors expected to profit in several ways from the efforts of DC Solar,
11 including lease revenue, certain tax benefits, and annual cash distributions. Compl. ¶¶
12 25-26, 31.  The Ninth Circuit has recognized that "the prospect of tax benefits . . .
13 does not necessarily detract from an expectation of profits."  *Goldfield Mines Co*.,
14 758 F.2d at 464; *see also Long v. Shultz Cattle Co*., 881 F.2d 129, 132 n.2 (5th Cir.
15 1989) ("The inducement of tax benefits such as those offered by SCCI's program
16 may constitute an expectation of 'profits' under the Howey test*.")*; *Kolibash v.
17 Sagittarius Recording Co*., 626 F. Supp. 1173, 1179 (S.D. Ohio 1986) ("excluding
18 tax benefits from the scope of the meaning of profits . . . flies in the face of the
19 economic reality.").

20     **C.    Lauer Is Not Shielded From Liability For His Fraudulent Conduct**
21            **Simply Because He Is A Lawyer**
22         Lauer fundamentally misses the import of the SEC's Complaint by arguing that
23 he had "a duty of confidentiality" *not* to reveal the fraud that existed at DC Solar and
24 makes the blanket assertion that his behavior was shielded by the attorney-client
25 privilege.  *See* Mot. 7-11.  The SEC's core allegations, however, have nothing to do
26 with Lauer keeping client confidences or privilege but rather squarely address his
27 knowing and intentional participation (while wearing a lawyer's hat) in DC Solar's
28 fraud.  *See* Comp. ¶¶ 38-64.  Lauer's role as a lawyer in no way immunizes him from

OPPOSITION TO MOTION
TO DISMISS                          13

1  liability.

2       Lauer self-servingly argues (without providing any facts or specific

3  communications whatsoever) that all the information that he failed to disclose to

4  investors was subject to an absolute privilege because it was "told to him by his

5  clients and therefore subject to the attorney-client privilege…." Mot. 10.  Putting

6  aside the generic and unsupported nature of this argument, Lauer's claim of privilege

7  is a fact-intensive affirmative defense that cannot be decided on a motion to dismiss.

8  As the party asserting privilege, moreover, Lauer—not the SEC—will bear the

9  burden of establishing that a privilege applied.  *See United States v. Graf*, 610 F.3d.

10  1148, 1156 (9th Cir 2010) (citations omitted) ("[A] party asserting the attorney-client

11  privilege has the burden of establishing the [existence of an attorney-client]

12  relationship *and* the privileged nature of the communication."); *United States v.*

13  *Dakota*, 197 F.3d 821, 825 (6th Cir. 1999) ("the burden of establishing the existence

14  of the privilege rests with the person asserting it").  Lauer has not even remotely

15  demonstrated in his Motion what supposed conversations were privileged as opposed

16  to misconduct in furtherance of a fraud:

17            [T]he mere attendance of an attorney at a meeting does not

18            render everything done or said at that meeting privileged. For

19            communications at such meetings to be privileged, they must

20            have related to the acquisition or rendition of professional legal

21            services.  The mere fact that clients were at a meeting with

22            counsel in which legal advice was being requested and/or

23            received does not mean that everything said at the meeting is

24            privileged.  The party seeking to assert the privilege must show

25            that the particular communication was part of a request for

26            advice or part of the advice.

27  *Neuder v. Batte/le Pac. N. W Nat. Lab.,* 194 F.R.D. 289, 292-93 (D.D.C. 2000)

28  (citations omitted).  *See also United States v. Sanmina Corp.*, 968 F.3d 1107, 1116

1    (9th Cir. 2020) ("The attorney-client privilege protects confidential communications

2    between attorneys and clients, which are made for the purpose of giving legal

3    advice.").

4         While he will have the opportunity to develop the factual basis for his

5    purported privilege claim, the SEC was under no obligation to address that defense in

6    its Complaint.  Significantly, there is no basis for the Court to rule on Lauer's defense

7    as a matter of law because it cannot be resolved without answering contested factual

8    questions about his role in the fraud and an analysis of specific communications

9    (which he has not identified in his motion) that he claims were privileged.  *See United*

10   *States v. Blackman*, 72 F.3d 1418, 1423 (9th Cir. 1995) (citations omitted) ("We

11   review *de novo* the district court's rulings on the scope of the attorney-client privilege

12   as they involve mixed questions of law and fact.").

13        The SEC's detailed allegations (*see supra* at pp. 2-6) related to Lauer's role in

14   DC Solar's fraudulent scheme, moreover, implicate the crime-fraud exception to the

15   attorney-client privilege.  Communications made for the purpose of obtaining advice

16   for the commission of a fraud are not protected by attorney-client privilege. The

17   attorney-client privilege cannot shield communications where a client consults

18   counsel to engage in ongoing or future fraudulent activity.  *See, e.g., United States v.*

19   *Zolin*, 491 U.S. 554, 562-3 (1989) (internal citation omitted) ("It is the purpose of the

20   crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy

21   between lawyer and client does not extend to communications made for the purpose

22   of getting advice for the commission of a fraud or crime").  Taking the SEC's well-

23   pled allegations as true, the Complaint reflects a classic example of the crime-fraud

24   exception, and Lauer's intentional efforts to mislead investors concerning DC Solar's

25   ongoing Ponzi scheme can neither be excused by the attorney-client privilege nor can

26   it be a defense to his knowing participation in a fraudulent scheme.  In any event,

27   Lauer's blanket and unsupported assertion of privilege is something that cannot be

28   decided on a motion to dismiss due both to the deficiencies of his motion and the

fact-intensive nature of such an inquiry.

### 1.     Lauer Engaged in Deceptive Scheme to Induce Investors to Enter into Lease Agreements and Was Not Merely Providing Legal Services

Lauer seeks to escape liability by mischaracterizing his misconduct as the provision of legitimate legal services in "arms-length" transactions (*see* Mot. 11-16) even though the Complaint alleges that he was an active participant in a massive Ponzi scheme involving billions of dollars.  *See, e.g.*, Compl. ¶¶ 4-8.  Lauer impermissibly tries to recast the SEC's Complaint from a fraud Complaint into one concerning contract law. The allegations of the Complaint, however, are squarely focused on his role in furtherance of the fraud scheme through the use of documents that he intentionally drafted to deceive and also by his misleading statements to investors.

For example, Company 3 sent Lauer a "Notice and Acknowledgment of Collateral Assignment," which provided that Lessee 2 would acknowledge and agree that it had irrevocably accepted the Generators for sublease and that the term of the sub-lease was 10 years.  Lessee 2, however, *refused* to sign the document because it was concerned that it would need Company 2's approval to change the terms of the sub-lease addendum.  Compl. ¶¶ 58-59.  Lauer then knowingly misrepresented to Company 3 that Lessee 2 would not sign the document because "[t]heir position is their relationship is with DC Solar.…"  *Id.* ¶ 60.  Lauer's representation was false and misleading.  He never told Company 3 the true reason why Lessee 2 refused to sign the document because he and DC Solar wanted to hide the actual terms of the Addendum from Company 3.  In the end, Lauer sent Company 3 a copy of the finalized sub-lease between DC Distribution and Lessee 2, but knowingly or recklessly withheld the Addendum that modified the terms of the sub-lease.  Comp. ¶ 62.

These allegations have nothing to do with the liability of lawyer providing

legitimate legal services.  None of the cases cited by Lauer, moreover, have anything to do with the situation here where it is alleged that a lawyer was a part of a fraud. Indeed, the case law is clear that a lawyer engaged in fraud can be held liable:  "[A] lawyer, no more than others, can escape liability for fraud by closing his eyes to what he saw and could readily understand. *Bentel v. United States*, 13 F.2d 327, 329 (2d Cir. 1926).  *See also SEC v. Frank*, 388 F.2d 486, 489 (2d Cir. 1968) ("The SEC's position is that Frank had been furnished with information which even a non-expert would recognize as showing the falsity of many of the representations…. If this is so, the Commission would be entitled to prevail; a lawyer, no more than others, can escape liability for fraud by closing his eyes to what he saw and could readily understand.").  The question of whether Lauer's conduct crossed the line, moreover, is bound up in contested facts that are not suited for resolution on a motion to dismiss:  [I]t is important that the court be seized of the precise facts, including the extent, as the SEC claimed with respect to Frank, to which his role went beyond a lawyer's normal one…." *Id.*

## 2.     Lauer Obtained Money Related to His Role in the Fraudulent Scheme

Lauer erroneously claims that he did not receive money or property because he purportedly was only "paid legal fees to prepare Transaction Documents." Mot. 17. The allegations of the Complaint, however, allege that Lauer was not merely a scrivener of generic legal documents but rather was one of the key architects of a sophisticated scheme and part of the inner-circle that helped to perpetuate it.  And for his efforts, Lauer was rewarded with a cut of the ill-gotten gains from the fraud.

Lauer, who served as the outside general counsel for DC Solar, played a pivotal role in the scheme from its inception.  He was aware that DC Distribution did not earn the lease revenue it claimed, yet he prepared transaction documents on behalf of DC Solar that misled investors about the true nature of the business and the amount of legitimate lease revenue. *See, e.g*, Compl. ¶¶ 52-55.  As described above,

OPPOSITION TO MOTION
TO DISMISS

17

for just two transactions alone, Lauer received $1,000,000 for successfully duping each of these investors. In all, Lauer received over $4.4 million in ill-gotten gains between 2013 through 2018 for his part in the fraudulent conduct, *not* for providing normal legal services. *Id.* ¶ 64. As such, the cases cited by Lauer (Mot. 17) are inapposite given that he richly shared in the ill-gotten proceeds of the fraud rather than merely compensated for drafting simple lease agreements.

### 3. Lauer Is Liable for Aiding Abetting DC Solar's Fraud

Lauer claims that he cannot be liable for aiding and abetting because "knowledge of a material omission is not enough. There must also be a duty to disclose." Mot. 17. Again, Lauer is not entitled to escape liability because he is a lawyer. *See supra* at pp. 13-17. The Complaint charges that he was a fraud participant, and these allegations are more than sufficient to support its charge of aiding and abetting.

Aiding and abetting liability requires "(1) the existence of an independent primary wrong [by the issuer], (2) actual knowledge or reckless disregard by the alleged aider and abettor of the wrong and of his or her role in furthering it, and (3) substantial assistance in the wrong." *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991). As described above, on numerous occasions, Lauer made untrue statements and omitted material facts in investor communications that were necessary to make statements made to investors and prospective investors not misleading. *See supra* at pp. 2-6. As a result of Lauer's intentional misconduct, he aided and abetted DC Solar's fraudulent scheme by providing substantial assistance to keep it afloat. *See* Compl. ¶¶ 4-8.

Finally, Lauer broadly argues that he cannot be held liable for aiding and abetting because he has no direct liability because of privilege. Mot. 18. Again, the Complaint is replete with examples of Lauer providing substantial assistance to the fraudulent scheme and this behavior is neither shielded by privilege nor is the issue of the existence of privilege resolvable at this stage of litigation. *See supra* at pp. 2-6

and 13-16.

## IV.   **CONCLUSION**

For all of these reasons, the Motion should be denied in its entirety.  If the Court is inclined to grant Defendant's Motion either in whole or in part, the SEC requests leave to amend.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).


Dated:  January 19, 2023                    Respectfully submitted,


                                            */s/ Dean M. Conway*

                                            Dean M. Conway
                                            Sarra Cho
                                            Attorneys for Plaintiff
                                            Securities and Exchange Commission

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2023, a copy of the foregoing document was served upon *pro se* Defendant Ari J. Lauer via ECF.


*/s/ Dean M. Conway*

Dean M.Conway
Attorney for Plaintiff
Securities and Exchange Commission