ARI J. LAUER (CA SBN 144017)
LAW OFFICES OF ARI J. LAUER
2125 Oak Grove Road, Suite 210
Walnut Creek, CA 94598
Tel: (925) 933-7012
Fax: (925) 933-7017
Email: alauer@lauerlaw.com

Attorneys for Defendant ARI J. LAUER

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. 2-22-CV-01726-DAD-DB |
| Plaintiff, | **REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS** |
| vs. | Date:        April 4, 2023 |
| ARI J. LAUER, | Time:        1:30 p.m. |
| Defendant. | Courtroom:  4 |

I.     <u>SUMMARY OF ARGUMENT</u>

The moving papers demonstrate (i) the transactions at issue fail all three prongs of the *Howey* test and therefore there is no security; (ii) Lauer owed no duty of disclosure to the Fund Investors or their counsel; (iii) Lauer owed a duty <u>not</u> to disclose the alleged statements due to the attorney-client privilege and the duty of confidentiality; and (iv) the alleged statements could not constitute securities fraud as they were made in deal documents which do not constitute representations and cannot be relied upon by the other side. Plaintiff's Opposition suggests Lauer is liable because he drafted deal documents and because he misled investors by not disclosing certain facts about Distribution's financial condition. In other words, plaintiff's Opposition merely restates the same fatally flawed theories in the Complaint. For these reasons, the motion should be granted.

## II. THERE IS NO "SECURITY" AS THE TRANSACTIONS AT ISSUE FAIL ALL THREE PRONGS OF THE *HOWEY* TEST

### A. The Transactions At Issue Fail The First Prong of the *Howey* Test

Plaintiff correctly states that Solutions was responsible for manufacturing the Generators and Distribution was responsible for subleasing the Generators to end users. (Opp. 12:19-21). However, throughout the Opposition, as it did throughout the Complaint, plaintiff collectively refers to Solutions and Distribution as "DC Solar" to attempt to blur the lines between these separate entities. When Solutions and Distribution are correctly identified for the roles they played, plaintiff's Opposition falls apart. As explained in Sections IV.C.ii and IV.C.iii of the moving papers, neither the purchase of Generators from Solutions nor the leasing of Generators to Distribution constitute an investment of money under the *Howey* test. Rather, the Fund Investors invested their money into their own LLC to purchase the Generators.

### B. The Transactions At Issue Fail The Second Prong of the *Howey* Test

Plaintiff argues the "inter-woven nature of the investments" satisfy the second prong of the *Howey* test, a common enterprise, since the investments were structured such that Solutions would be responsible for manufacturing and selling the Generators and Distribution would be responsible for subleasing them to end users. (Opp. 12:5-9). This argument misses the point as the "common enterprise" test from *Howey* requires a direct correlation between success or failure of the promoter's efforts and success or failure of the investment. *S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 463 (9th Cir. 1985). The alleged "inter-woven" relationship between Solutions and Distribution is irrelevant.

Plaintiff also suggests the second prong is satisfied because the ability of the investors to receive lease payments was tied to Distribution generating sublease revenue from end users. (Opp. 11:9-12). This is factually incorrect in that Distribution's

1  obligation to make lease payments was not tied to sublease revenue. In addition,

2  Distribution's expertise in subleasing the Generators cannot be a basis to satisfy the second

3  prong of the *Howey* test as this exact argument was raised and rejected in *Mordaunt v.*

4  *Incomco*, 686 F.2d 815 (9th Cir. 1982).

5

6      In *Mordaunt*, plaintiffs opened discretionary commodities trading accounts with

7  defendants who operated a commodities brokerage.  Plaintiffs argued the second prong of

8  the *Howey* test was satisfied because the success or failure of their investments was

9  essentially dependent on promoter expertise. The Court rejected this argument, clarifying,

10      "The Mordaunts argue that vertical commonality exists by reason of the fact
        that the success or failure of the investments collectively is essentially
11      dependent upon promoter expertise. This contention, based on the reasoning
        in *SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974), was
12      considered and rejected in *Brodt*. Under *Brodt*, there is no common
        enterprise unless there is some direct relation between the success or failure
13      of the promoter and that of his investors. In this case, as in *Brodt*, such direct
        relation is lacking. Incomco earned commissions totalling $20,190.00 on the
14      Mordaunts' accounts during the period in which the Mordaunts' collective
        losses amounted to $27,385.03." *Id.* @ 817.
15

16      Similar to *Mordaunt*, the Fund Investors received lease payments from Distribution.

17  Whether Distribution recognized a profit or loss depended on how many Generators it

18  subleased, while its rent payment to the Fund Investors remained fixed.  There is no

19  common enterprise because there is no direct relation between the success or failure of

20  Distribution and the success or failure of the Fund Investors.

21

22      In finding the second prong of the *Howey* test not met, the Court in *Mechigian v.*

23  *Art Capital Corp*, 612 F. Supp. 1421, 1428 (S.D.N.Y. 1985) reasoned,

24

25      "The expansion of the scope of the securities laws sought by the plaintiff
        herein seems to me to be unwarranted and even perhaps detrimental to the
        common good. In our mercantile economy, we should not try to turn every
26      'thing' which might be purchased and sold into a 'security.' If we did, every
        commercial contract would end up being enforced in the Federal Courts in
27      what some plaintiffs and their attorneys would turn into class actions. Clearly
        this is not what was intended by Congress in passing the Securities laws."
28

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**

1   The Fund Investors purchased Generators from Solutions. That is not an investment

2   contract.  The Fund Investors leased the Generators to Distribution. The lease is not an

3   investment contract. As the Court cautions in *Mechigian*, every commercial contract is not

4   a security; this is not what Congress intended in passing the Securities laws.

5

6   **C.      The Transactions At Issue Fail The Third Prong of the *Howey* Test**

7   The third prong of the *Howey* test is profits derived solely from the efforts of others.

8   (1946) 328 U.S. 293, 298-99.  Any efforts to be contributed by the investor beyond

9   ministerial preclude coverage of the securities laws.  *Cordas v. Specialty Restaurants, Inc.*,

10  470 F. Supp. 780, 786 (D. Or. 1979).

11

12  In *Howey,* the promoter owned large tracts of citrus acreage.  The investors

13  purchased narrow strips of land in varying sizes.  These strips of land were not separately

14  fenced and the sole indication of ownership was small land marks intelligible only through

15  a plat book record.  *Id.* @ 295.  The promoter was given full discretion and authority over

16  the cultivation of the groves and the harvest and marketing of the crops. The investors had

17  no right to enter their land without the consent of the promoter, nor did they have any right

18  to make suggestions as to the care and cultivation of the crop.  The investors had no right

19  to specific fruit and all of the produce was pooled by the promoter.  The promoter was

20  accountable only for an allocation of net profits based upon a check made at the picking

21  the fruit. *Id.* @ 296.

22

23  The Supreme Court found the facts in *Howey* to constitute an investment with

24  profits to come solely from the efforts of others because the "tracts gain utility as citrus

25  groves only when cultivated and developed as component parts of a larger area" and "the

26  promoters manage, control and operate the enterprise."  *Id.* @ 300.  In other words, the

27  investors in *Howey* were true bystanders or passive investors. They could not visit or even

28  identify their land, nor make suggestions as to the care and cultivation of the crop.  They

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**

1  were completely dependent upon the promoter to grow and sell the fruit and their

2  investment success required the involvement of other tracts of land.

3

4        The Fund Investors were at the opposite end of the spectrum from the investors in

5  *Howey*. The Fund Investors knew which Generators were theirs, could inspect them at any

6  time, collected the lease revenue themselves, were not dependent on Generators from other

7  Funds for the success of their investment, and managed, controlled and operated the

8  leasing of the Generators.  Given their unfettered rights and complete freedom to control

9  their investment, the Fund Investors fall miles short of satisfying the third prong of the

10  *Howey* test, profits derived solely from the efforts of others.

11

12        Plaintiff makes much of the fact the investors were "not in the business of operating

13  or leasing Generators themselves." (Opp. 11:25-26).  However, this fact is neither

14  dispositive nor relevant.  An investor who has the ability to control the profitability of his

15  investment is not dependent upon the managerial skills of others. *Gordon v. Terry*, 684

16  F.2d 736, 741 (11th Cir.1982). The fact an investor has delegated management duties or

17  has chosen to rely on some other party does not establish dependency. The investor must

18  have no reasonable alternative to reliance on the promoter.  *Id.* @ 741-42.

19

20        In *Alunni v. Dev. Res. Grp., LLC*, 445 F.Appx. 288 (11th Cir. 2011), the Court held

21  the plaintiffs' purchase of condominium units did not satisfy the second or third prongs of

22  the *Howey* test because once the existing leases expired, plaintiffs were free to lease their

23  units or occupy the units themselves.  The Court concluded plaintiffs were not dependent

24  on the management skills of others because they had the ability to control the profitability

25  of their individual units, explaining:

26          "Plaintiffs contend that third-party management was essential because the
        plaintiffs all lived in the Chicago area or other areas similarly far from the

27          Kissimmee, Florida location of Legacy Dunes. Additionally, they contend
        that they all purchased their Legacy Dunes units as investments and not for

28          their own use. However, plaintiffs had other options that did not entail the

**REPLY BRIEF IN SUPPORT OF MOTION TO
DISMISS**

1  use of third-party management. Even if purchasing the units as an
2  investment, a plaintiff could have chosen to re-sell his unit for a profit either
   before or after the existing long-term lease expired. Or a plaintiff could have
   chosen, once the one-year Sovereign exclusivity period ended, to lease his
3  unit himself or through another rental agency." *Id.* @ 297.

4  Plaintiff has not, and cannot allege that if Distribution breached the lease, or the

5  lease expired, it would be impossible for the Fund Investors to lease the Generators to a

6  third party without the help of Distribution.  The Solar Generators are intended to take the

7  place of diesel generators and supply power to locations where electricity is not available.

8  Mobile Generators are used by construction companies, movie sets, and for nighttime

9  highway repair, as just a few examples.   Similar to the plaintiffs in *Alunni*, the Fund

10  Investors could lease the Generators themselves, or through a broker or other

11  knowledgeable third party.  Plaintiff fails the third prong of the *Howey* Test as they had

12  reasonable alternatives to reliance on the promoter.

13

14  **D.  The Fund Investors "Reliance" on Distribution is Irrelevant**

15  Plaintiff argues the third element of the *Howey* test is satisfied because the investors

16  relied on the efforts of Distribution to sublease the Generators.  (Opp.: 12:28-13:1).  This

17  argument fails for two reasons. First, Distribution's obligation to make the lease payments

18  was not conditioned upon Distribution subleasing the Generators. Second, this argument

19  was expressly rejected in *Elson v. Geiger*, 506 F. Supp. 238, 243 (E.D. Mich. 1980),

20  "The return on investment that had been promised to the purchasers was the
21  lessee's fixed rent payment, which was totally independent of its profits or
   managerial expertise. Although the Plaintiffs argued that seller-lessee's
22  managerial ability was requisite to a continuation of the timely rental
   payments, **this contention alone does not meet the Howey test. Every**
23  **lessor, in some measure, is reliant upon his commercial lessee's ability to**
   **manage the business profitably; however, such reliance will not render**
24  **every commercial lease a security."** (Emphasis added.)

25  *Elson* clarifies that every lessor relies on their lessee to operate their business

26  profitably so the lessee can make the lease payments.  However, this reliance does not meet

27  the *Howey* test.  Similarly, the Fund Investors reliance on Distribution to sublease the

28  Generators and run its business profitably does not meet the *Howey* test.

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**

**E.      The Cases Cited By Plaintiff Actually Support A Finding of No Security**

Plaintiff cites *SEC v. Edwards*, 540 U.S. 389 (2004) and *SEC v. Nationwide Automated Sys. Inc.*, 2014 WL 12811969 (C.D. Cal. 2014) to suggest the transactions at issue are investment contracts.  These cases actually support dismissal of the Complaint.

In *SEC v. Edwards,* the sole issue before the Court was whether an investment promising a fixed rate of return can be an investment contract.  Nonetheless, an examination of the facts in *Edwards* is instructive. The investors purchased payphones and then leased them back to the promoter.  In addition to a lease, the *Edwards* investors signed a Management Agreement and Buyback Agreement with the promoter. As a result, the promoter selected the site for the phones, installed the equipment, arranged for connection and long-distance service, collected coin revenues, maintained and repaired the phones, and agreed to buyback the equipment for the full purchase price at the end of the lease or within 180 days of purchaser's request.  540 U.S. @ 391-92.

Unlike *Edwards*, the Fund Investors did not have an agreement with Solutions or Distribution to manage their investment, collect lease revenue, or buyback the Generators upon expiration of the lease.  Whereas the investors in *Edwards* could do nothing but watch and hope their investment paid off, the Fund Investors had to actively manage their investment, including collecting lease revenue, enforcing the lease in the event of breach, and finding another lessee if Distribution breached the lease or the lease expired.  Also, the investors in *Edwards* could enforce the buyback agreement upon notice at any time and get back their full investment.  The Fund Investors had no such option.

In *SEC v. Nationwide Automated Sys. Inc.*, the investors purchased ATMs and then leased them back to the promoter with a guaranteed investment return of at least 20% per year.  Not only was the promoter responsible for placing, operating and maintaining the ATMs, the investors were contractually bound not to contact any of the locations where

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**

1   the ATMs were located.  In addition, the promoter would send monthly reports to the

2   investors indicating performance of the ATMs.  2014 WL 12811969 at *2.  Similar to

3   *Edwards*, the facts of *Nationwide* are strikingly different than the transactions at issue

4   herein and easily distinguished.  In *Nationwide*, the investors had to be solely dependent on

5   the efforts of the promoter as they were forbidden from having any contact with the

6   locations where their ATMs were located.  In other words, they could do nothing

7   themselves to contribute to the success of the investment and were dependent on the

8   promoter to determine the lease revenue. As noted above, the Fund Investors owned the

9   Generators and were responsible for all aspects of keeping the Generators leased and

10  collecting lease revenue, and had to determine on their own the revenue collected.

11

12  **III.    LAUER CANNOT BE LIABLE FOR DRAFTING DEAL DOCUMENTS**

13          Plaintiff alleges Lauer drafted the Equipment Leases to create "the false appearance

14  that DC Distribution could generate sufficient sub-lease revenue to make lease payments."

15  (Compl. ¶¶48-52).  As explained in the moving papers,

16          -        The sublease created an obligation to pay, not a representation of

17                   Distribution's ability to pay.  (Section VI.B.)

18          -        An attorney drafting deal documents is not making representations to the

19                   opposing party.  (Section VI.E)

20          -        The investors and their counsel cannot rely on Lauer's "representations."

21                   (Section VI.F)

22          -        An attorney providing legal services is not enough to establish liability.

23                   (Section VI.G)

24          -        Lauer allegedly being aware of Distribution's financial condition and

25                   drafting the deal documents does not constitute fraud.  (Section VI. H.)

26

27          Plaintiff offers no authority to challenge any of the foregoing legal principles.

28  Instead, plaintiff cites two cases for the proposition that a lawyer that engages in fraud can

**REPLY BRIEF IN SUPPORT OF MOTION TO
DISMISS**

1    be liable. However, one cite appears to be in error and the other cite is misleading.

2

3        Plaintiff cites *Bentel v. United States*, 13 F.2d 327, 329 (2nd Cir. 1926) for

4    authority that a lawyer cannot escape liability by closing his eyes to what he saw and could

5    readily understand.  (Opp. 17:3-6).  This citation appears to be in error as there are no

6    lawyers as parties in *Bentel* and the language cited is nowhere to be found in this nearly

7    100-year old opinion. *Bentel* holds there was sufficient evidence for a jury to support

8    convictions of the two defendants.  *Bentel* does not even mention the proposition for

9    which it is cited.

10

11       Plaintiff also cites *SEC v. Frank*, 388 F.2d 486, 489 (2nd Cir. 1968), citing the same

12   quote attributed to *Bentel* about lawyers closing their eyes to escape liability. Plaintiff cites

13   *Frank* for the SEC's position in the case, not the holding of the Court.  In fact, the Court

14   rejects the SEC's position as extreme, noting,

15           "**The instant case lies between these extremes**. The SEC's position is that
             Frank had been furnished with information which even a non-expert would
16           recognize as showing the falsity of many of the representations quoted in fn.
             1, notably those implying extensive and satisfactory testing at factories and
17           indicating that all had gone passing well at the test by the Army Laboratories.
             If this is so, the Commission would be entitled to prevail; a lawyer, no more
18           than others, can escape liability for fraud by closing his eyes to what he saw
             and could readily understand. **Whether the fraud sections of the securities
19           laws go beyond this and require a lawyer passing on an offering circular
             to run down possible infirmities in his client's story of which he has been
20           put on notice, and if so what efforts are required of him, is a closer
             question on which it is important that the court be seized of the precise
21           facts, including the extent, as the SEC claimed with respect to Frank, to
             which his role went beyond a lawyer's normal one.**" (Citations omitted,
22           emphasis added).

23

24       In sum, plaintiff's novel and untenable theory that an attorney preparing deal

25   documents constitutes fraud for purposes of the securities laws must be rejected out of

26   hand.  Otherwise, the chilling effect on transactional attorneys would be frightening.

27

28

_____

**REPLY BRIEF IN SUPPORT OF MOTION TO
DISMISS**

1    **IV.     LAUER CANNOT BE LIABLE FOR NONDISCLOSURE**

2         **A.     No Liability for Failure to Disclose Absent a Duty to Do So**

3         Section V of the moving papers explains that absent a duty to disclose, there can be

4    no 10b-5 liability for nondisclosure. Section V further explains that Lauer owed no duty to

5    the Fund Investors or their counsel.  Since no such duty exists, no action for securities

6    fraud can be maintained against Lauer.  Plaintiff's Opposition ignores entirely this fatal

7    flaw in their Complaint.

8

9         **B.     The Attorney-Client Privilege**

10        Plaintiff suggests the Complaint "reflects a classic example of the crime-fraud

11   exception" and thus Lauer's failure to disclose privileged information is not excused by the

12   attorney-client privilege.  (Opp. 15:23-25).  Plaintiff's position ignores the law.

13

14        California Business and Professions Code section 6068 provides it is the duty of an

15   attorney to:

16        "(e) (1) To maintain inviolate the confidence, and at every peril to himself or herself
          to preserve the secrets, of his or her client.
17             (2) Notwithstanding paragraph (1), an attorney may, but is not required to,
          reveal confidential information relating to the representation of a client to the
18        extent that the attorney reasonably believes the disclosure is necessary to
          prevent a criminal act that the attorney reasonably believes is likely to result
19        in death of, or substantial bodily harm to, an individual."

20

21        Similarly, California Rule of Professional Conduct 1.6 provides, in pertinent part:

22        (a)     A lawyer shall not reveal information protected from disclosure by Business
                  and Professions Code section 6068, subdivision (e)(1) unless the client gives
23                informed consent, or the disclosure is permitted by paragraph (b) of this rule.
          (b)     A lawyer may, but is not required to, reveal information protected by
24                Business and Professions Code section 6068, subdivision (e)(1) to the extent
                  that the lawyer reasonably believes the disclosure is necessary to prevent a
25                criminal act that the lawyer reasonably believes is likely to result in death of,
                  or substantial bodily harm to, an individual, as provided in paragraph (c).
26                                      *     *     *
27        (e)     A lawyer who does not reveal information permitted by paragraph (b) does
                  not violate this rule.
28

**REPLY BRIEF IN SUPPORT OF MOTION TO
DISMISS**

1    Thus, an attorney is not required to divulge attorney-client privileged information
2    based on the crime-fraud exception.

3

4    **C.    The Duty of Confidentiality**

5    The duty of confidentiality under California law "is broader than the lawyer-client

6    privilege and protects virtually everything the lawyer knows about the client's matter

7    regardless of the source of the information." *Elijah W. v. Superior Court*, 216 Cal.App.4th

8    140, 151 (2013).  This ethical duty of confidentiality is much broader in scope and covers

9    communications that would not be protected under the attorney-client privilege. *Goldstein*

10   *v. Lees,* 46 Cal.App.3d 614, 621, fn. 5  (1974).

11

12   In *Matter of Foster*, No. 17-O-00414, 2020 WL 1280223 (Cal. Bar Ct. Mar. 16,

13   2020), an attorney discussed his client's finances, revealing his client was "out of money"

14   and "absolutely broke."  The Court noted an attorney's duty of confidentiality is broad in

15   scope and protects communications that would not be protected under the attorney-client

16   privilege.  *Id.* @ *5.  The Court found the attorney revealed specific confidential

17   information about his client's finances without her permission, thereby violating his duty

18   of confidentiality.  Plaintiff's Complaint alleges Lauer should have disclosed

19   Distribution's financial condition to the Fund Investors. In other words, Lauer should have

20   violated his duty of confidentiality.

21

22   Plaintiff alleges Lauer failed to disclose Distribution's lease revenue (Compl. ¶39),

23   that Solutions was using money from new investors to "infuse Distribution's bank account

24   with cash" (Compl. ¶39), that Jeffrey Carpoff lied to investors  (Compl. ¶43), and that he

25   hid Distribution's lease revenue from investors (Compl. ¶¶38, 40). As noted above, the

26   duty of confidentiality protects virtually everything the lawyer knows about the client's

27   matter regardless of the source of the information. All of plaintiff's allegations regarding

28   nondisclosure fall squarely within Lauer's Duty of Confidentiality to his clients not to

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**

1   disclose.  Even if plaintiff is believed that some of these allegations of nondisclosure may

2   fall outside the attorney-client privilege, all such allegations are prohibited from disclosure

3   by Lauer's duty of confidentiality.

4

5   **VII.    LAUER DID NOT OBTAIN MONEY OR PROPERTY**

6          The payment of legal fees is not obtaining money or property by means of an

7   alleged misrepresentation.  *United States Securities and Exchange Commission v.*

8   *Wey*, 246 F.Supp.3d 894, 915 (S.D.N.Y. 2017).  Plaintiff's opposition misses the point,

9   citing the amount of money Lauer received but not disputing such payments were for legal

10  fees.  (Opp. 17:28 - 18:4).  Lauer was outside counsel for DC Solar and prepared the

11  transaction documents.  (Compl. ¶7).   There is no allegation he was an owner, officer,

12  board member or employee of Solutions or Distributions. As such, payments for his legal

13  services would be legal fees.

14

15  **VIII.  NO  AIDING AND ABETTING LIABILITY**

16         As explained in Section VIII of the moving papers, there can be no aiding and

17  abetting liability since Lauer had no duty to disclose and no direct liability.  The Third and

18  Fourth Claims for Relief should be dismissed.

19

20  **IX.    CONCLUSION**

21         For the foregoing reasons, as well as those reasons set forth in the moving papers,

22  defendant Ari J. Lauer respectfully requests the Court grant his Motion to Dismiss for

23  Failure to State a Claim Upon Which Relief Can Be Granted.

24
                            Respectfully submitted,
25
                            LAW OFFICES OF ARI J. LAUER
26

27                          By: _____
                                         ARI J. LAUER
28                              Attorneys for Defendant

                                                            _____
                                                            **REPLY BRIEF IN SUPPORT OF MOTION TO
                                                            DISMISS**

                                      12

## CERTIFICATE OF SERVICE

I certify that on January 27, 2023, a copy of the foregoing document was served upon all counsel of record via ECF.

_____
ARI J. LAUER

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**